SEAWOOD *v.* OZAN LUMBER COMPANY.

4-9899                                      252 S. W. 2d 829

Opinion delivered November 17, 1952.

Rehearing denied December 15, 1952.

*John H. Wright,* for appellant.

*Tompkins, McKenzie & McRae,* for appellee.

MINOR W. MILLWEE, Justice. Appellants brought this suit to partition an 80-acre tract of land and for an accounting of the sale proceeds of timber cut from the land by appellee, Ozan Lumber Co. Appellants claimed ownership of an undivided 3/9 interest in the land as heirs of Amaziah Wilson, deceased. Appellee, Ozan Lumber Co. defended on the grounds that appellants were barred of recovery by limitations and laches and asked that its title be quieted. Trial resulted in a decree in favor of appellee in which the chancellor held that appellants were barred by laches.

Amaziah Wilson was the owner of the 80-acre tract at the time of his death, intestate, in 1900. He was survived by his widow who died in 1927 and by nine children. Appellants are the children of three of these nine children. Tennie Ivory, daughter of Amaziah Wilson, lived near the land and looked after it following the death of her parents. The land forfeited for the 1920 taxes and J. A. Carr obtained a clerk's tax deed in 1923. In December, 1925, Carr executed to Tennie Ivory a quit claim deed which was recorded in January, 1926. In August, 1926, Carr executed a quit claim deed to the timber on the land to Tennie Ivory. In the same month Tennie Ivory executed a deed conveying all pine timber on the land to Louisiana Pulp & Paper Co. and this deed was recorded in September, 1926. In July, 1926, she also executed a deed of one-half the minerals to A. D. Madding.

On December 1, 1928, four of the nine children of Amaziah Wilson, who were all the original nine children then living except Tennie, executed a quit claim deed conveying the land to Tennie Ivory and this deed was filed for record January 1, 1929. According to the testimony of Tennie Ivory she then executed a mortgage to

W. P. Adams to secure money with which to defray expenses of her husband's illness. She denied her signature to a $300 note dated February 26, 1929, payable to Adams and reciting that it was secured by a deed of trust on the lands in controversy. Neither the note nor a deed of trust was introduced in evidence. Although Tennie Ivory admitted that she executed a mortgage to Adams, she stated that she repaid the loan and denied her signature to a warranty deed executed and filed for record January 5, 1935, conveying the whole title to Adams and reciting a consideration of $300.

On May 1, 1941, W. P. Adams executed a warranty deed conveying 794 acres of land to Thomas Brothers, a partnership, and the 80-acre tract in controversy was included in the deed. Adams died March 1, 1942. On June 10, 1947, Thomas Brothers conveyed the 80 acres to appellee, Ozan Lumber Co., by warranty deed which was filed for record June 14, 1947. This deed included a total of 5,034 acres at a recited consideration of $277,500, or an average price of approximately $54 per acre.

Adams paid taxes on the tract for the years 1935 to 1939. Thomas Brothers paid for the years 1940 to 1946 and appellee for the years 1947 to 1950. The lands in controversy are in timber and except for one small strip have been unoccupied and unenclosed for more than forty years. The tract is located one-half mile from a road and adjacent to land owned and resided upon by Johnnie Milton who testified that he cultivated and fenced about two acres of the land in controversy in 1947 when appellee cut some timber on the tract. According to Milton this cultivation was under an agreement with appellant, Richard Griffen, that Milton would look after the timber on the entire tract in lieu of payment of rent. Appellee made no complaint to Milton about cultivation of the strip when it cut some timber from the 80-acre tract in the fall of 1947. The county surveyor testified that the cultivated strip contained about three or four acres.

Richard Griffen and some of the other appellants live about 17 miles from the 80-acre tract. He testified

that he thought Tennie Ivory was looking after the land for all the heirs; that he had been over the land several times in recent years, but had not talked to Tennie Ivory about tax payments for "a good while". He also stated that he discussed the ownership of the lands with Adams and did not know about Thomas Brothers buying the land or cutting timber on it in 1943, but knew of the purchase by appellee before it cut some timber from the lands in 1947. Other witnesses who resided in the vicinity did not know of the timber cutting by Thomas Brothers in 1943.

The testimony of Tennie Ivory is rather confusing. She stated that she looked after the lands for all the heirs; denied that the deed from Carr in 1925 was made to her alone; and had no recollection of executing the timber and mineral deeds in 1926. She further testified that Adams had some patches worked on the 80-acre tract "after he got the land". She also stated that she learned of the deed to Thomas Brothers shortly after Adam's death in 1942 when she talked with the Thomases about the sale and also told the other heirs about it. While she was negotiating with Thomas Brothers, the latter sold the land to appellee.

Nathan Thomas testified that the partnership cut several thousand feet of timber from the land in 1943 and he did not learn that they did not have full record title to the lands until 1947. At that time he was advised by counsel for appellee that there were outstanding heirs to the property. Before the sale, and in an effort to cure the record title, he then talked with Tennie Ivory who told him that she did not have a deed from all the heirs when she acquired the interest of some of them in 1928. His testimony was corroborated by that of his brother and it would seem that the negotiations had by the partnership with Tennie Ivory with reference to the interest of the other heirs were in 1947 rather than in 1942 as she testified.

Appellee, Ozan Lumber Co., cut and removed about 10,000 feet of timber from the land in 1947 and had cut

about 60,000 feet in 1949 when this suit was instituted. Appellee knew that the record title showed there were outstanding heirs to the land when they purchased in 1947. The timbered 80-acre tract had a value of approximately $200 in 1935, $1,000 in 1941, $7,500 in 1947, and $10,000 in 1949 when the suit was instituted. The evidence as to values is to the effect that the price paid for the land by appellee in 1947 represented less than 2/3 of its actual value at that time.

Although the chancellor found that appellants were barred by laches from claiming any interest in the lands, appellee earnestly insists that appellants were also barred by the seven-year statute of limitations (Ark. Stats., § 37-101) when that statute is construed in connection with Ark. Stats. § 37-102 and the payment of taxes for more than seven years by appellee and its predecessors in title. Appellee relies on the cases of *McGill* v. *Adams,* 120 Ark. 249, 179 S. W. 489; *Smith* v. *Boynton Land & Lumber Co.,* 131 Ark. 22, 198 S. W. 107; and *Patterson* v. *Miller,* 154 Ark. 124, 241 S. W. 875. It is true that in these cases the court held that seven years payment of taxes on wild and unimproved land under color of title is equivalent to actual possession, but the rights of cotenants were not involved in these cases.

When Tennie Ivory acquired the interests of her four brothers and sisters in 1928, she became the owner of an undivided 5/9 interest in the land. When she conveyed to W. P. Adams in 1935, the latter became a cotenant with the appellants who owned an undivided 3/9 interest in the land. The 1935 deed, though recorded, was not in appellants' line of title and did not, therefore, constitute constructive notice to them. This court so held in *Singer* v. *Naron,* 99 Ark. 446, 138 S. W. 958. The rule is well settled that where one or more cotenants convey the entire fee to a stranger the conveyance gives color of title, and if possession is taken, and the grantee claims title to the whole, it amounts to an ouster of the cotenants and the possession of the grantee is adverse to them. *Parsons* v. *Sharpe,* 102 Ark. 611, 145 S. W. 537;

*Bowers* v. *Rightsell,* 173 Ark. 788, 294 S. W. 21. Appellee concedes that the rule announced in these cases is not directly applicable here since there has been no actual possession of the lands in controversy by any of the parties for many years. But it is insisted that the deed from Tennie Ivory to Adams in 1935 conveying the whole title was an act of ouster and that the payment of taxes thereunder for seven years ripened into title under § 37-102, *supra.*

Both parties rely on *Brasher* v. *Taylor,* 109 Ark. 281, 159 S. W. 1120. In that case the circuit court held that an action of ejectment could not be maintained by the plaintiff cotenants where the defendants were not in actual possession of the lands which were wild and unenclosed. This court reversed and held that payment of taxes for seven years under the statute was equivalent to possession and that actual possession was, therefore, no longer an indispensable prerequisite to the right to bring an ejectment action. There the defendants and their predecessors in title had paid taxes on the lands for 37 years during which time the lands had sold at an execution sale and there had been several conveyances beginning with that of the grantee under the execution deed. The court said: ''There is nothing in the record to show that the plaintiffs had actual knowledge that T. J. Brasher had conveyed the entire tract of land to the defendants or their predecessors in title. The fact that the plaintiffs never paid any taxes on the land and made no efforts whatever to assert their title to the land during the long period of time that the taxes were paid by the defendants and their grantors raises a strong presumption that they recognized the claim of title of the defendants and their grantors as superior to their own, or, at least, that they had abandoned any claim of their own to the land, but this is a presumption of fact and does not become a conclusive presumption of law.''

While it is true that in the Brasher case the court held that payments of taxes for seven years under color of title constituted such possession as would authorize an action in ejectment, it did not hold that defendants

thereby acquired title by adverse possession. If the court had intended to so hold, it would have rendered judgment for defendants since it was undisputed that they and their predecessors in title had paid the taxes for 37 years. The clear implication of the holding in that case is that payment of taxes on wild and unimproved lands for the statutory period by one tenant in common is not equivalent to actual possession so as to ripen into title by adverse possession as against his cotenants, at least, in the absence of a further showing that the latter had actual knowledge of the conveyance or that there are such notorious acts of ouster by the former as to put his cotenants on notice that the full title is claimed. While the chancellor did not pass on this issue, we do not think appellee's plea of limitations is sustained by a preponderance of the evidence.

As to the defense of laches which was sustained by the able chancellor, it may first be pointed out that the appellants are not seeking equitable relief, but only to enforce a legal title, and the doctrine of laches does not apply in such cases. See *Beattie* v. *McKinney,* 160 Ark. 81, 254 S. W. 338, and cases there cited. Regardless of this we do not think appellants are barred by laches.

The following definition of the doctrine set forth in 5 Pomeroy, Eq. Jur. (3rd Ed.) § 21, has been repeatedly approved and applied by this court: "Laches, in legal significance, is not mere delay, but delay that works disadvantage to another. So long as parties are in the same condition, it matters little whether he presses a right promptly or slowly within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has in good faith become so changed that he can not be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of the right. The disadvantage may come from the loss of evidence, change of title, intervention of equities, and other causes; but when a court sees negligence on one side, and injury therefrom on the other, it

is a ground for denial of relief." *Tatum* v. *Arkansas Lumber Co.;* 103 Ark. 251, 146 S. W. 135.

Since appellee purchased the land with full knowledge of appellants' interests it is difficult to see how it could claim injury on account of appellants' delay in asserting their rights. Neither appellee nor its predecessors have made any improvements on the land and its increased value on account of rising timber prices is incidental and unrelated to any merit of the appellee or fault of the appellants. The relative positions of the parties here have not been changed by delay. The fact that the land was worth at least a third more than the price paid by appellee would indicate that it was not misled to its prejudice. In *Avera* v. *Banks,* 168 Ark. 718, 271 S. W. 970, the plaintiff cotenants sought to cancel numerous leases and mineral deeds to lands that had suddenly become valuable for the production of oil. Having sought such equitable relief, the court held that laches applied and that the defendants had a right to interpose it as a defense. It was further held that plaintiffs were precluded from maintaining the suit by a decree confirming the tax title of one of the cotenants and that plaintiffs had actual knowledge of his adverse claim of title. Other facts distinguished that case from the case at bar.

Having concluded that appellants are not barred from maintaining the instant suit by limitations or laches, the decree is reversed and the cause remanded with directions to enter a decree for the appellants in accordance with this opinion.