**NATIONAL BANK OF EASTERN AR-KANSAS et al., Plaintiffs,**

v.

**Noah BLANKENSHIP et al., Defendants.**

**Civ. No. 641.**

United States District Court
E. D. Arkansas, E. D.
Sept. 25, 1959.

E. J. Butler, Forrest City, Ark., for plaintiffs.

Nathan M. Norton, Forrest City, Ark., Ralph M. Sloan, Asst. U. S. Atty., A. E. Townsend, Jr., and Luke Arnett, Atty. for Arkansas State Labor Department, Little Rock, Ark., for defendants.

HENLEY, Chief Judge.

This cause, which was commenced in the Chancery Court of St. Francis County, Arkansas, and removed to this court by the defendant United States of America, has been submitted to the Court upon the pleadings and exhibits thereto, an agreed statement of facts with exhibits attached, certain testimony taken ore tenus, and written briefs. The Court, being well and sufficiently advised, files this memorandum opinion, incorporating herein its findings of fact and conclusions of law.

The plaintiffs, National Bank of Eastern Arkansas, E. J. Butler, trustee for said bank, and Fred Swan, brought this action to foreclose deeds of trust on three parcels of land in St. Francis County, Arkansas, the property of the defendant, Noah Blankenship.[1] In addition, the

1. For a number of years prior to 1957, Mr. Blankenship was engaged in the business of buying, processing and selling poultry in St. Francis County and in

plaintiff bank seeks to have the liens of the three deeds of trust held by it declared superior to liens held by the defendants, United States, General Mills, Inc., and Cameron Feed Mills, Inc., and to a tax lien held by the defendant, C. R. Thornborough, who is Commissioner of Labor of the State of Arkansas.[2]

The three tracts of land involved in this case will be referred to, respectively, as Parcel No. 1, Parcel No. 2, and Parcel No. 3. Parcel No. 1 consists of a lot in Forrest City, Arkansas, upon which prior to his bankruptcy Blankenship operated a store. Parcel No. 2 is a 44-acre farm in St. Francis County owned by Blankenship. And Parcel No. 3 is another city lot in Forrest City which constitutes Blankenship's homestead. After the institution of this action a receiver was appointed to take over these properties, and the same are now in his hands.

The Bank holds deeds of trust covering each of these tracts of land, and there is no question that the lien of each of those deeds of trust is a first and paramount lien on the parcel of land covered thereby to the extent of the primary obligation described in said instrument. The Bank contends, however, that by virtue of "dragnet clauses" appearing in its security instruments it has a prior lien on all of Blankenship's properties securing all three primary obligations described in the respective deeds of trust, and further securing certain alleged future advances which it claims to have made to Blankenship on the strength of said instruments. The other lien holders that have been mentioned, and who are

defendants herein, deny the validity of the Bank's broad claim to priority and also contend that the Bank made an improper application of the proceeds of the bankruptcy sale of certain chattels of Blankenship on which it held chattel mortgages. There is also an issue with respect to the Bank's claim for the allowance of an attorney's fee. In resolving these disputes the Court is governed by the law of Arkansas.

The lien history of each of the three parcels of land above described is as follows:

### Parcel No. 1—The Store.

On April 14, 1951, Blankenship and his wife borrowed $2,750 from N. P. Dean, and gave him their note for that amount, which note bore 6% interest, and on which there is now due the sum of $1,841.57, plus interest. This note was secured by a deed of trust covering the parcel of land now under consideration.

On June 16, 1956, Blankenship and his wife borrowed $2,600 from the plaintiff Bank, giving their note therefor, on which note, as of July 30, 1957, there was due the sum of $2,300 principal, plus interest amounting to $161.39. That note was secured by a deed of trust on the store property, which instrument contained the stipulation that it stood as security not only for the $2,600 primary obligation but also for "any further sums which the (Bank) * * * may advance to take care of taxes, insurance or prior encumbrances on the above described real estate, or any part thereof." And the instrument further provided

other counties in the vicinity. In the course of his business he had substantial dealings with the plaintiff, National Bank of Eastern Arkansas, and was also a customer of the defendants, General Mills, Inc., hereinafter called "General Mills", and Cameron Feed Mills, Inc., hereinafter called "Cameron". In 1956, his business failed; he was adjudicated a bankrupt and subsequently received a discharge in bankruptcy. The trustee in bankruptcy disclaimed any interest in the real estate here involved. Neither Blankenship nor his wife, who was also made a

defendant herein, has entered any appearance or filed any pleadings in the case.

2. The State's tax lien, it is conceded, stands at the foot of the order of priority of the several liens affecting Blankenship's property, and in view of the extent of his obligations, it is obvious that the State will receive nothing from the sale of the properties. For that reason, no further mention of the State's claim will be made. Of course, such rights as it may have will be protected in the decree.

670

that: " * * * this trust deed shall also secure any and all further advances, now or hereafter owing by (the Blankenships) to (the Bank) whether evidenced by note endorsement, book account or otherwise until final satisfaction of the Trust Deed of record."

While the Bank's deed of trust on this tract was more than five years junior to the note and deed of trust executed in favor of N. P. Dean, the record discloses that on the same day that the Bank obtained its trust deed the plaintiff, Fred Swan, who had in the meantime purchased the Dean note, agreed that the deed of trust securing the note last mentioned should be subordinated to the lien of the Bank.

By the summer of 1956, Blankenship was heavily indebted to General Mills and to Cameron on account of purchases of merchandise, principally chicken feed. To secure his account with General Mills Blankenship on July 6, 1956, executed a deed of trust covering all three of the parcels here involved, and in October of that year he gave a mortgage on all three tracts to Cameron to secure the account owed by him to that creditor. There is now due General Mills the sum of $8,100 plus 6% interest from December 6, 1956; and there is due Cameron the sum of $25,678, plus interest.

Parcel No. 2—The Farm.

This parcel is encumbered by a deed of trust in favor of the Bank, dated December 5, 1953, and now securing an indebtedness of $2,975.79, plus interest, evidenced by a renewal note, dated November 13, 1956, which superseded an original note in the sum of $3,294.32, which was of even date with the deed of trust.

This tract is also subject to two mortgages in favor of the Guardian Company, which were given to secure F.H.A. loans, and which have been assigned to the Government. The first mortgage given to the Guardian Company was dated December 28, 1953, and there is now due on the note secured by it the sum of $155.05 as principal, plus a small amount of interest. The second mortgage to Guardian

was executed on December 24, 1955, and there is now due on the note secured by it the sum of $832.97. These two mortgages taken together constitute a second lien on this parcel.

As indicated, this piece of land is also subject to General Mills' deed of trust and to Cameron's mortgage.

The deed of trust in favor of the Bank provided that in addition to the primary obligation the instrument should also secure "any and all other indebtedness now or hereafter owing by Noah Blankenship * * * to the party of the third part, whether evidenced by note, account, endorsement or otherwise until final satisfaction of this trust deed of record."

Parcel No. 3—The Home.

The first lien on this tract is a deed of trust in favor of the Bank, dated September 8, 1951, securing a loan of $1,600, plus 6% interest, on which loan there was due as of July 30, 1957, a balance of $1,295.72 principal and $62.21 interest. That instrument recited that it was agreed and understood "that this note and trust deed is to secure the third party for any other indebtedness we, or either of us, now or may hereafter owe it, either as principal, endorser or otherwise and until paid in full and St. Francis County records are satisfied."

The General Mills deed of trust is a second lien on this tract of land; and the Cameron mortgage constitutes a third lien.

All of the deeds of trust and mortgages above mentioned were duly filed for record and recorded.

Ignoring for the present all questions of future advances and of the operation and effect of the "dragnet clauses" in the Bank's deeds of trust, it appears from what has been said that the lien status of each of these parcels of land, as far as the primary obligations secured by the respective security instruments are concerned, is as follows:

*Parcel No. 1:* The Bank has a first lien securing its primary obligation of $2,300, plus interest. Fred Swan has a second

lien securing a balance of $1,841.57, plus interest. General Mills has a third lien securing a debt of $8,100, plus interest. And Cameron has a fourth lien for $25,678, plus interest.

*Parcel No. 2:* The Bank has a first lien securing a primary obligation of $2,975.79, plus interest. The Government holds security amounting to a second lien securing balances totaling $988.02, plus interest. General Mills and Cameron hold third and fourth liens as aforesaid.

*Parcel No. 3:* The Bank has a first lien securing a primary obligation of $1,600, plus interest. The second and third liens are held by General Mills and Cameron, respectively.

The parties have stipulated that in addition to the primary obligations specifically described in its deeds of trust the Bank "made new loans, advances, renewals and extensions to Noah Blankenship and Beulah Blankenship evidenced by notes and obligations executed by them to the bank * * *" The agreed statement of facts then lists twelve notes executed by the Blankenships, the earliest being dated December 22, 1955, and the last bearing date of April 11, 1957. It further appears from the agreed statement that in October, 1957, the Bank received $1,491.32 as proceeds from the bankruptcy sale of certain mortgaged chattels, and applied that sum so as to retire completely three of the twelve notes and to reduce a fourth.[3] The total amount of the unpaid principal of the nine remaining notes is $1,164.50.

The agreed statement of facts, to which reference has been made, was filed on January 15 of the current year. In preparation for the trial of the case the Court examined the pleadings, exhibits, and the agreed statement, and it occurred to the Court that there were certain mat-

---

3. The notes remaining unpaid are as follows:

1. Note dated December 22, 1955, in the original sum of $732. As of July 30, 1957, there was due thereon $402 principal and $15.16 interest.

2. Insurance premium servicing note, dated May 8, 1956, in the original amount of $153.57. As of July 30, 1957, there was due thereon the sum of $19.24 principal, plus 64¢ interest.

3. Insurance premium servicing note, dated June 30, 1956, in the original amount of $320. On July 30, 1957, there was due $231 principal. (Amount of interest not given.)

4. Insurance premium servicing note, dated August 3, 1956, in the original amount of $198.77. As of July 30, 1957, there was due $75.57 principal, plus $1.75 interest.

5. Premium servicing note, dated August 27, 1956, in the original sum of $1,061. On July 30, 1957, there was due thereon the sum of $836. Out of the proceeds of the bankruptcy sale $717.36 was applied on this note so as to reduce it to the principal sum of $118.64.

6. Insurance premium servicing note, dated September 10, 1956, in the original sum of $180.55. As of July 30, 1957, there was due thereon the sum of $112.80 principal, plus $1.53 interest.

7. Insurance premium servicing note, dated November 3, 1956, in the original sum of $180.50. As of July 30, 1957, there was due thereon the sum of $135 principal and $1.22 interest.

8. On March 13, 1957, the Bank paid the Diffey Insurance Agency at Forrest City to protect its security insurance premiums amounting to $99.35, and took Blankenship's note therefor. No part of this note has ever been paid.

9. A similar transaction took place on April 11, 1957, the amount of the payment by the Bank being $46.47; no part of the note given by Blankenship on account of that payment has ever been paid.

The three notes retired by the Bank out of the proceeds of the bankruptcy sale were as follows:

1. Note dated March 8, 1956, in the sum of $525; by July 30, 1957, this note had been reduced to $135 principal and $3.20 interest, and in October of that year the Bank applied $140.79 of the proceeds of the sale to satisfy the obligation in full.

2. Note dated August 7, 1956, in the sum of $424.67; in October of that year the Bank applied $293.55 out of the proceeds of the sale in full satisfaction of the note.

3. Note dated November 13, 1956, in the sum of $321.65, which was an extension of a previous note dated February 18, 1955. In October, 1957, the Bank applied $339.22 out of the proceeds of the sale in full satisfaction of that note.

ters that might be relevant and which were not fully covered by the agreed statement or disclosed by the exhibits. Subsequently, a letter was addressed to counsel advising them of the trial date and that it appeared to the Court that the factual issues included the following: "1. The nature and purposes of the three basic loans which the Bank made to Mr. Blankenship. 2. The precise nature of the debts evidenced by the several promissory notes that were not secured by specific deeds of trust. 3. The question of whether or not the Bank had actual notice of advances made by junior lienors, assuming that actual rather than constructive notice is necessary."

At the commencement of the trial counsel for the Bank and for General Mills called the Court's attention to the fact that the stipulation provided that the case would be submitted thereon, together with the exhibits thereto and the exhibits to the pleadings, "without the introduction of other evidence except that evidence may be introduced on the question whether the Plaintiff bank had actual notice of the deed of trust to Defendants General Mills and the Guardian Company and on the question whether Plaintiff bank made proper application of the sum of $1,491.32 received by it from sale of chattels in the bankruptcy court, and on question amount of attorney fees to which the Plaintiff bank is entitled." And counsel objected to the introduction of testimony on any issue other than those just mentioned. Upon such objection being made, the Court advised counsel that they would not be required to put on any evidence that they did not desire to introduce, but that if they cared to make proof on the questions mentioned in the Court's letter, they might do so without waiving their objections, and that such proof would be received subject to the objections. Both the Bank and General Mills then introduced evidence, some of which went beyond the scope defined by the agreed statement.

That evidence has been considered for what it is worth, and the Court does not feel that it is of controlling importance. For that reason it is not deemed necessary to pass upon the objections that were made to the introduction of such evidence.

## I.

The contention of the Bank which gives rise to the principal controversy between the parties is that by virtue of the "dragnet" and "future advances" clauses in the deeds of trust held by it, it has a prior lien or prior liens on all three parcels of the Blankenship land to secure the payment of all of Blankenship's indebtedness, including the nine unpaid notes not specifically described in any of the security instruments. As the Court understands it, the Bank's argument is that the earlier obligations are secured by the "dragnet clauses" in the subsequent deeds of trust, and that the later ones were "future advances" such as would be secured by the earlier security instruments. In the circumstances present here, the Court is unable to accept that contention.

There is no question that under Arkansas law the parties to a mortgage or deed of trust may by contract extend the lien thereof to obligations other than those specifically described in the instrument, provided they express their intent to do so with sufficient definiteness. Hughes, Arkansas Mortgages, Sections 73, 74 and 75; Moore v. Terry, 66 Ark. 393, 50 S.W. 998; Word v. Cole, 122 Ark. 457, 183 S.W. 757; Patterson v. Ogles, 152 Ark. 395, 238 S.W. 598; Page v. American Bank of Commerce & Trust Co., 167 Ark. 607, 269 S.W. 561; Hollan v. American Bank of Commerce & Trust Co., 168 Ark. 939, 272 S.W. 654; American Bank & Trust Co. v. First National Bank of Paris, 184 Ark. 689, 43 S.W.2d 248; Hendrickson v. Farmers' Bank & Trust Co., 189 Ark. 423, 73 S.W. 2d 725; Bank of Searcy v. Kroh, 195 Ark. 785, 114 S.W.2d 26; Holt v. Gregory, 219 Ark. 798, 244 S.W.2d 951; Ashdown Hardware Co. v. Hughes, 223 Ark. 541, 267 S.W.2d 294. Every mortgage is to be interpreted in the light of its own language, and "as there is no limitation

upon the right to contract with reference to the extent of the debt secured by a mortgage \* \* \* the province of the court is merely to interpret the language and declare the rights of the parties in accordance with their intentions as expressed in the language used." Hollan v. American Bank of Commerce & Trust Co., supra, 168 Ark. at page 941, 272 S.W. at page 655.

While a provision in a mortgage that it shall be security for indebtedness other than the primary obligation described therein is valid, a reading of the Arkansas cases indicates that such provisions are not favorites of equity, and that they will be construed rather strictly. In this connection, in Berger v. Fuller, 180 Ark. 372, 377, 21 S.W.2d 419, 421, the Court said: "Mortgages of this character have been denominated 'anaconda mortgages' and are well named thus, as by their broad and general terms they enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate, and to extend them further than has already been done would, in our opinion, be dangerous and unwise \* \* \*."

The "other indebtedness" secured by a mortgage may be either antecedent or subsequent. Where it is antecedent, it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred. Hendrickson v. Farmers Bank & Trust Co. and Bank of Searcy v. Kroh, both supra.

In Hendrickson, supra, the Court stated:

"As suggested by our early cases, in the construction of a mortgage the real question is, 'What was the intention of the parties to the mortgage?' In determining this, all the circumstances attendant upon the execution of the mortgage and the nature of the transaction itself are to be considered \* \* \*; and, in order to extend the intention of the parties beyond the primary purpose of the mortgage so as to secure the payment of debts other than those specifically mentioned, from our decisions and principles of natural justice the following rule may be deduced; Where a mortgage is given to secure a specific debt named, the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms, and, to be extended to cover debts subsequently incurred, these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. The reason is that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate. 'Where one contracts in good faith with a debtor that security given should include not only that specifically mentioned in the mortgage but other indebtedness, whether existing then or to be incurred in the future, it is not difficult to describe the nature and character thereof so that both the debtor and third parties may be fully advised as to the extent of the mortgage.' American Bank & Trust Co. v. First National Bank of Paris, supra." 189 Ark. at pages 433–434, 73 S.W.2d at page 729.

In a slightly earlier portion of the opinion the Court, in differentiating between the description to be given to an antecedent debt and that to be used in connection with future advances, said: "A debt created subsequent to the mortgage, being not yet in existence, may not in all cases be clearly indicated; whereas, antecedent debts may always be definitely stated, and for this reason the general expression, 'other indebtedness,' would usually be treated as referring not to an antecedent debt but to one subsequently incurred. Detroit Fire & Marine Ins. Co. v. Helms, 184 Ark. 308, 42

S.W.2d 394; First National Bank of Corning v. Corning Bank & Trust Co., 168 Ark. 17, 268 S.W. 606, 607. In the latter case it was decided, after naming a particular debt secured, that the expression, 'together with all other indebtedness which may be due,' would not cover antecedent debt evidenced by notes, but only advances subsequently made." Ibid., 189 Ark. at pages 432–433, 73 S.W.2d at page 729.

Applying the foregoing principles to the case in hand, it is at once plain that the later deeds of trust taken by the Bank did not secure the earlier obligations of Blankenship since those obligations were not definitely described therein, although such could easily have been done, and, under the cases cited, should have been done if the Bank desired to have additional security with respect to said obligations. The language in the "dragnet clauses" is entirely general, and while it might include subsequent advances, it is not sufficient to embrace antecedent debts. Hendrickson v. Farmers' Bank & Trust Co., and Bank of Searcy v. Kroh, both supra.

With regard to the question of whether the subsequent primary obligations are secured by the liens of the earlier deeds of trust, the Court cannot say either from the pleadings and their exhibits or from the agreed statement and its exhibits that those subsequent obligations were of the same class as their predecessors, or that they bore any significant relation to the earlier loans; nor, in the Court's estimation, can the requisite similarity of class and the necessary relationship be found from a consideration of the testimony that was received over the objections of both the Bank and General Mills. On the other hand, the Court is of the opinion that the three basic loans to Mr. Blankenship were entirely separate and distinct transactions, taking place at separate times, and that the loans were secured by separate deeds of trust on separate pieces of real property. Such being the case, the lien of the deed of trust covering the home is not security for the subsequent loans secured

by deeds of trust on the farm and the store property; nor is the deed of trust on the farm security for the loan secured by the deed of trust on the store.

Support for this view is found in Page v. American Bank of Commerce & Trust Co., supra. In that case the appellee bank had a financing arrangement with an automobile dealer under the terms of which it would lend him 80% of the purchase price of each shipment of cars received by him, and would take a chattel mortgage on each shipment. Each of the mortgages involved contained a "future advances" clause fully as broad as those involved in the instant case. It was held that the several loans made by the bank to the automobile dealer were separate and distinct transactions, and that a mortgage taken with respect to one shipment was not a lien securing advances made on the security of another shipment. The pertinent language of the opinion is as follows: "We think the proper interpretation of the clause for advances in the several mortgages, was to secure any additional advances which appellee might make on any particular shipment, and not to secure independent loans secured by other mortgages on independent shipments. The clause was not intended to cover loans secured by separate mortgages on entirely different property, but to secure advances related and incident to each particular contract and shipment." 167 Ark. at page 611, 269 S.W. at page 562. The Court feels that the principle announced in that decision is applicable here.

It is true that the Bank's witnesses testified that all of the loans were made for the purpose of promoting the general business welfare of Mr. Blankenship. Accepting that testimony at face value, at least for present purposes, the Court does not think that it establishes a sufficient connection between the loans; it could have been argued with equal force in the Page case, supra, that all of the loans there made to the automobile dealer were for the general purpose of assisting him in his business. Nor does the Court attach controlling importance to

the testimony of Mr. Blankenship (assuming that it was admissible in the face of the objections of General Mills), that he understood that each piece of his property was subject to a lien for everything that he owed the Bank. His testimony on that point was somewhat contradictory, and it seems to the Court that the extent of such a lien should be measured primarily by the intent of the parties as disclosed objectively by the language used when considered in the light of the nature of the transaction involved and the surrounding facts and circumstances. Subsequent testimony as to pre-existing subjective understandings and intents should be received with caution.

## II.

In order to dispose of the controversy with respect to the priority, if any, to be accorded the debts evidenced by the nine notes that were not specifically mentioned in any of the deeds of trust, it will be necessary to consider the individual notes in some detail. Before doing that, however, the Court deems it well to pass upon a more general aspect of this controversy.

Some of these notes were given to evidence advances made after the junior liens were filed for record. It is the theory of the Bank that it had no actual notice of the filing of the junior liens, and that in the absence of such notice these subsequent debts, to the extent that they are secured by one or more of the three deeds of trust, take the priority of those instruments notwithstanding the intervening liens. The other creditors contend that the Bank did have actual notice of the junior liens, and, in addition, that irrespective of actual notice, the filing of the later lien instruments was constructive notice to the Bank and that any advances thereafter made by it are subordinate to the junior liens.

On the factual question the Court finds from the evidence that the Bank had no actual notice of the junior liens when the subsequent advances were made. And the Court finds itself in agreement with the Bank as to the necessity for such notice.

Where a mortgage or deed of trust is given to secure future advances, and the making of such advances is optional with the lender, as was the case here, the law is that where the advances are made after "notice" of the filing of an intervening lien has been received by the original creditor, his lien for such subsequent advances is inferior to the later lien. Superior Lumber Co. v. National Bank of Commerce, 176 Ark. 300, 2 S.W.2d 1093. By the weight of authority the notice that the senior lienholder must have before his advances will be subordinated to a junior lien is "actual", as contrasted to "constructive" or "record" notice. 36 Am.Jur. "Mortgages", Section 235; see also annotation in 138 A.L.R. 566, 579.

While the Court has found no Arkansas case that is directly in point, Arkansas decisions on analogous questions clearly indicate that when this question is squarely presented, the Supreme Court of Arkansas will align itself with the majority view. See Seawood v. Ozan Lumber Co., 221 Ark. 196, 252 S.W.2d 829; Singer v. Naron, 99 Ark. 446, 138 S.W. 958, and Birnie v. Main, 29 Ark. 591. And in Hughes, op. cit., Section 146, it is said that the effect of recording a mortgage is not retrospective, and that a mortgagee is charged with notice of the state of the title as of the date of his mortgage, but is not charged with notice of instruments subsequently recorded. Although the Court in Superior Lumber Co. v. National Bank of Commerce, supra, did not differentiate in its opinion between actual and constructive notice, an examination of the appellants' brief in that case, a copy of which brief has been made available by counsel for the Bank, discloses that the notice involved in that case was actual and not constructive. Further, in the recent case of Ashdown Hardware Co. v. Hughes, supra, 223 Ark. at page 547, 267 S.W.2d at page 298, the Court said: "The general rule is stated in 5 A.L.R. 399, in this lan-

guage: 'By the weight of authority, a mortgage for future advances becomes an effective lien from the time of its execution, or as to subsequent purchasers and encumbrancers, from the time of its recordation, rather than from the time when each advance is made, where the making of the advances is obligatory upon and not merely optional with the mortgagee * * * Or where such advances are made without *actual notice* of the claim forming the basis of the * * * lien." (Emphasis added.) The obvious reason for the majority rule is that the junior lienholder who has constructive notice of the senior lien can always protect himself by giving notice to the holder of that lien.

Coming now to the individual notes, it is clear that in view of the Court's holding with respect to the scope of the three deeds of trust none of these notes is entitled to priority unless it can be said that it is secured by one or more of the deeds of trust, and unless the Court can identify the deed or deeds within the security of which such note is included. It is to be noted in this connection that none of these notes was taken at a time when the Bank did not have at least two deeds of trust covering separate parcels of land. In considering these notes, the Court has been faced with difficulty arising from the lack of specific evidence as to the details of the transactions which resulted in the execution of the instruments. The nature of this difficulty will become apparent as the notes are analyzed.

■ The first note, dated December 22, 1955, at a time when the Bank had liens on the home and the farm, is in the sum of $732. The note does not disclose the purpose for which it was given; it was signed by three people in the following order: 1) The defendant, Harry G. Statts, who filed no answer herein and who is not identified in the record. 2) Annie Statts. 3) Noah Blankenship. On the face of the instrument is an almost illegible notation which the Court interprets as being, "Security of Poole Blankenship prev. given." Judging from the order of the signatures, it would seem likely that the primary obligation was incurred for the benefit of Statts, and that the other signers, including Blankenship, were his sureties, but the Court does not know that; neither can the Court ascertain the meaning of the quoted notation. In view of the complete absence of evidence bearing upon the nature of the transaction and the purpose for which the note was given, the Court is simply unable to say that the debt evidenced thereby was an advance of the same class as the loans made upon the home or the farm, or that it had any relation whatever to those loans. Hence, the unpaid balance of that note will not be accorded any priority under any of the deeds of trust.

With minor exceptions, the next six notes were to finance certain insurance premiums on motor vehicles owned by Blankenship. The exceptions are that Note No. 2 was given in part for a premium on an insurance policy covering the home and contents thereof, the amount of that premium being $67.50, and that note No. 4 was given in part for a premium on a policy covering the contents of the store, the amount of that premium being $15.90.

It appears that all of Blankenship's insurance was handled by the Diffey Insurance Agency at Forrest City, and in view of the relationship between the Bank and Blankenship it seems reasonable to believe that the Bank held his policies. Under such circumstances it should not have been difficult for the Bank to bring before the Court precise evidence as to the motor vehicles insured and as to the types of insurance that Blankenship was carrying on them, but no effort was made to do this. The Court cannot tell the number or types of vehicles which Blankenship operated, or with one exception what vehicle or vehicles was, or were, included in the individual policies identified on the faces of the respective notes by date and number only. Nor can the Court differentiate between vehicles used in Blankenship's business and those, if any, which were kept for the personal

use of himself and wife; and the Court is equally unable to say which vehicles were used in connection with the farm or which were used in connection with the store, or which were used in both of his operations. Note No. 5 does disclose that it was secured by a chattel mortgage on a 1953 Chevrolet truck, and by "other security previously given", and the record does reflect that that particular vehicle was sold in the bankruptcy proceedings, and the proceeds applied so as to reduce the note to $118.64.

The burden was upon the Bank to establish that it is entitled to priority with respect to these insurance premium notes, and speculation cannot supply the absence of proof. The Court is unable to find from the record that those notes, insofar as they cover automobile insurance premiums, were future advances within the coverage of any particular one or more of the lien instruments.

As stated, Note 2 represented in part the premium on a policy covering the home and its contents; the balance due on this note as of July 30, 1957, was $19.24, plus 64¢ interest. The total premium for the insurance on the dwelling and contents was $67.50. The Court is of the opinion that the latter sum was a future advance within the coverage of the deed of trust on the home place, and also feels that the payments that the Bank has received on this note should be apportioned first to the automobile insurance, which the Court has held to be an unsecured obligation. It follows, therefore, that the Bank's prior lien on the home will be extended to include this $19.24 plus interest.

Similarly, with regard to Note No. 4, the Bank's prior lien on the store will be extended to include the sum of $15.90 plus interest, representing that part of the note given in payment of the premium for insurance on the contents of the store.

The two final notes evidence direct payments by the Bank of insurance premiums to protect its security, and the notes mention four separate policies. In-dulging the reasonable assumption that the property insured consisted of improvements on Blankenship's real estate, it would seem that these notes would be entitled to the benefit of the several deeds of trust, and the Court would so hold and would give them priority if it could tell what property was covered by what policy, but this it cannot do, and for that reason priority must be denied.

### III.

The views heretofore stated may render unimportant the question of the propriety of the allocation made by the Bank of the proceeds of the bankruptcy sale of the mortgaged chattels. Nevertheless, the Court will dispose of that question.

In its brief General Mills says that the proceeds of the sale of security should be applied to the secured debt. This is doubtless true, and the Court is convinced that it was done in this case. The four notes that were paid in full or reduced out of the proceeds of the sale were all secured by chattel mortgages on various items of personal property. The notes themselves, copies of which were attached to the complaint, so show, and the Bank's witness, Mr. Laughinghouse, contrary to the apparent recollection of counsel for General Mills as expressed in his brief, testified that the note dated August 7, 1956, was secured by a chattel mortgage on some chicken batteries; that the November 13, 1956 note had as its security a chattel mortgage on Blankenship's tractor and crops; that the security for the March 8, 1956 note was a chattel mortgage on a walk-in cooler; and that the note of August 27, 1956, was secured by a chattel mortgage on a truck. All of those chattels were sold in connection with the bankruptcy proceedings.

The Court, therefore, finds no fault with the application made by the Bank.

### IV.

The notes secured by deeds of trust on the home and farm provide for attorney's fees; and it is not disputed

that the Bank is entitled to the allowance of fees on those notes, and that such fees will constitute prior liens on the respective pieces of property above mentioned. In this connection Ark.Stats., Section 68–910, which was Act 350 of 1951, provides that a stipulation in a promissory note for the payment of reasonable attorneys' fees, not to exceed ten percent of the amount of principal due, plus accrued interest, for services actually rendered in accordance with its terms is enforceable as a contract of indemnity. As indicated, the maximum fee allowed by the statute is 10% of the unpaid principal, plus accrued interest, and the Court finds that the Bank is entitled to the allowance of that maximum with respect to each of the two notes.

The note secured by the deed of trust on the store contains no provision for the allowance of an attorney's fee, but such a provision is found in the security instrument itself. The Court is confronted, therefore, with the question of whether such provision can be enforced.

Prior to the passage of Act 350 of 1951 the Courts of Arkansas were committed to the view that provisions for attorneys' fees contained in notes, mortgages and deeds of trust were penalties, and that their enforcement offended public policy. American Exchange Trust Co. v. Truman Special School Dist., 183 Ark. 1041, 40 S.W.2d 770; Federal Land Bank of St. Louis v. Craig, 176 Ark. 381, 3 S.W.2d 34; Bank of Holly Grove v. Sudbury, 121 Ark. 59, 180 S.W. 470; Jarvis v. Southern Grocery Co., 63 Ark. 225, 38 S.W. 148; Boozer v. Anderson, 42 Ark. 167; Hughes, op. cit., Section 114. That this public policy was a strong one is indicated by the fact that the Arkansas courts would not enforce such stipulations even where valid under the laws of the states where the contracts were made or where the obligations were payable. White-Wilson-Drew Co. v. Egelhoff, 96 Ark. 105, 131 S.W. 208; Arden Lumber Co. v. Henderson Iron Works & Supply Co., 83 Ark. 240, 103 S.W. 185; see also

Miller v. American Insurance Company of Newark, N. J., D.C.Ark., 124 F.Supp. 160, 162, note 4.

It will have been noticed that the statute changing the common law rule in Arkansas is by its terms limited to promissory notes; nothing is said about provisions for attorneys' fees appearing in security instruments or contracts in general. As to the scope and purpose of the statute, in a note appearing in 7 Ark.Law Review 70, 71, the writer, Mr. Robert V. Light has this to say: "The General Assembly of 1951 attempted to change the rule in promissory note situations by characterizing an agreement in a note for reasonable attorney's fees * * * as a contract of indemnity * * * It is yet to be determined whether the Arkansas court will construe this as a pervasive legislative statement of public policy, thereby extending it to contracts in general, or will strictly limit the expressed policy to promissory notes".

At the time that the 1951 statute was adopted the Arkansas Legislature was presumably aware of the judicial prohibition against enforcement of provisions for attorneys' fees, whether such provisions appeared in promissory notes or in security instruments, and had it desired to do away with that rule as applied to such provisions appearing in mortgages or deeds of trust as well as in promissory notes, it could easily have said so. In view of the fact that, as stated, the former public policy was a strong one, this Court is unwilling to predict that the Supreme Court of Arkansas will extend the statute beyond its express terms. Further, in its final brief the Bank agrees that "it is only entitled to an allowance for attorney's fees in instances where the *promissory notes* so provide." (Emphasis supplied.) Hence, no attorney's fee can be allowed as to the store property.

The fact that the Court is allowing the maximum statutory fee of 10% with respect to the notes secured by deeds of trust on the home and farm is not to be taken as an indication that the Court feels that 10% of the amount of the

Bank's claims against Blankenship would be adequate compensation for all of the services that counsel for the Bank has performed in the prosecution of those claims; it is simply the statutory maximum for which the Court can award judgment.

Within the next ten days counsel should submit a precedent for a decree providing that the receiver, as special master, shall sell the properties here involved, each tract to be sold separately. The Court does not know that the order in which the tracts are offered makes any particular difference, and counsel may well be able to agree on the order in which they shall be sold; if not, the Court can go into the matter further.

Upon the sale of the properties the proceeds derived from the respective tracts shall be kept separate, and the proceeds from each tract shall be charged with its pro rata share of the costs of this action, and the expenses of the sale and of the receivership.

The net proceeds from the sale of Parcel No. 1 shall be applied first to the satisfaction of the unpaid balance of the Bank's note dated June 16, 1956, plus accrued interest thereon, and the $15.90 insurance item, together with interest thereon. The overplus, if any, shall then be applied in satisfaction of the Swan note, dated April 14, 1951. Should such proceeds be more than sufficient to discharge the obligations just mentioned, the balance should be applied toward the satisfaction of the remaining liens of General Mills, Cameron Feed Mills, and the State of Arkansas, in their respective order of priority.

Out of the net proceeds derived from the sale of Parcel No. 2 there should first be discharged the unpaid balance of the Bank's renewal note, dated November 13, 1956, plus accrued interest and the 10% attorney's fee; the overplus, if any, should then be applied to the satisfaction of the liens now held by the Government. Any surplus remaining thereafter should be applied to the remaining liens in their established order.

The net proceeds of the sale of Parcel No. 3 should be applied first to the unpaid balance of the Bank's note dated September 8, 1951, plus accrued interest, the 10% attorney's fee, and the $19.24 insurance item, plus interest. The overplus, if any, should then be applied to the remaining liens.

Since Blankenship has been discharged in bankruptcy, there can be no deficiency judgments.

In order that this case may be disposed of as soon as possible, the receiver should move diligently after the entry of the decree to sell the properties, prepare his report of sale and other necessary documents, and his final report as receiver, which should contain his application for the allowance of his fee both as receiver and as special master.